# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| ERIC BOATRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 5:21-CV-28 |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This action is before the Court on Defendant's motion for summary judgment. Dkt. No. 22. For the reasons given below, the motion is **DENIED in part and GRANTED in part.**

## BACKGROUND

In 2005, Plaintiff Eric Boatright ("Plaintiff") began working for Defendant CSX Transportation Inc. ("Defendant," "CSX" or "CSXT") as a utility worker in Defendant's Waycross Locomotive shop, which is a part of its Jacksonville Division.[1] Dkt. No. 26-1 at 9:9-12; Dkt. No. 22-4 ¶ 2. Upon hiring, Defendant provided Plaintiff a copy of its Employee Operating Manual, which contains

---

[1] When evaluating a motion for summary judgment, "[a]ll evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." Hardigree v. Lofton, 992 F.3d 1216, 1223 (11th Cir. 2021) (citing Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007)).

Defendant's Operating and Safety Rules. Dkt. No. 26-1 at 11:10-12, 73:3-8, 74:4-13; Dkt. No. 22-2 at 159; Dkt. No. 22-4 at 33:15-18. Defendant also required that Plaintiff, like all Defendant's employees, pass a test on the Operating and Safety rules. Dkt. No. 26-1 at 12:22-13:19; see also Dkt. No. 22-4 at 33:20-23 (Q: "And again, whose responsibility is it to know the rules and policies of CSX?" A: "The employee's."); Dkt. No. 26-1 at 74:24-75:8 (acknowledging that employees are required to know the rules and contact a supervisor for clarification if there is uncertainty). Defendant administered the test to Plaintiff's training group as a whole, allowing the trainees to answer the questions together. Dkt. No. 26-1 at 12:22-13:19. For Plaintiff's initial training, he received "one or two days" of classroom training watching instructional videos. Id. at 9:25-10:19. Defendant then placed him with other workers in the field for "on-the-job" training. Id. at 14:1-15:11. The following year, Plaintiff became a CSX machinist, and Defendant placed him in the field with other machinists for on-the-job training. Id. at 16:9-17:11. Plaintiff also received annual or biannual training throughout his employment with Defendant. Id. at 10:20-25, 71:23-72:1.

## I.   The Disciplinary Policy.

Defendant applies a disciplinary policy to machinists like Plaintiff that it calls "the Individual Development and Personal Accountability Policy for Operating Craft Employees" ("IDPAP").

Dkt. No. 22-4 at 9. The 2017 version of the IDPAP rules ("2017 rules") were in effect until September 24, 2018, when Defendant revised the IDPAP rules ("2018 rules"). Id. ¶ 3. IDPAP categorizes offenses as "major" or "non-major." Id. at 10, 14. Any rule violation that "do[es] not result in derailment or damage to equipment" or that is otherwise not individually identified in IDPAP as a "major" offense is considered "non-major." Id. Defendant may dismiss an employee for a single major offense. Id. at 10-11, 15. Defendant provides progressive discipline for non-major violations. Id. at 10, 14. When an employee commits a first non-major violation during a three-year period, the employee may (a) sign a waiver and receive a formal reprimand or (b) undergo a formal hearing and, if found guilty, receive a fifteen-day suspension (under the 2017 rules) or a one-day suspension (under the 2018 rules). Id. When an employee commits a second non-major violation within three years, the employee can (a) sign a waiver and receive a fifteen-day suspension (2017 rules) or a one-day suspension (2018 rules) or (b) undergo a formal hearing and, if found guilty, receive a thirty-day suspension (2017 rules) or a three-day suspension (2018 rules). Id. When an employee commits a third non-major violation within three years, the employee does not have the option of waiving the investigatory hearing and accepting discipline; the employee must attend a formal hearing. Id. The punishment for a third non-major violation is a thirty-

day suspension (2017 rules) or a five-day suspension (2018 rules) or dismissal (2017 and 2018 rules). Id.

To begin a disciplinary proceeding, a manager "enters an assessment," which is an electronic record with a description of the perceived rule violation. See Dkt. No. 22-1 at 8 n.3; Dkt. No. 22-4 at 52:43-53:8, 97:7-24, 115:34-42 (managers discussing entering assessments against Plaintiff). Using the assessment, Defendant (1) determines whether the offense is major or non-major and (2) issues a "charge letter," which notifies the employee of the rules he has allegedly violated and schedules a hearing on the charges if necessary. Dkt. No. 22-6 ¶ 19.

## II.  **The sleeping on a locomotive discipline.**

On January 24, 2017, Defendant charged Plaintiff with sleeping on a locomotive. Dkt. No. 22-2 at 23:7-16; Dkt. No. 22-4 ¶ 4; Dkt. No. 22-4 at 6 (assessment stating that Plaintiff "was observed in a reclining position sleeping" and "neglected his duties for several hours during the work shift"). Plaintiff waived his right to a formal hearing and accepted responsibility for the incident. Dkt. No. 22-2 at 21:4-12, 23:7-16; Dkt. No. 22-4 ¶ 4. Defendant suspended Plaintiff for thirty days and labeled the incident as "[m]ajor/[s]erious". Dkt. No. 22-4 at 6; Dkt. No. 22-4 ¶ 4.

### III. The gasket incident discipline.

The next incident occurred on June 14, 2018. Dkt. No. 22-4 at 6. Defendant assigned Plaintiff to work the third shift, which lasts from 11:00 p.m. to 7:00 a.m. Dkt. No. 22-2 at 26:8-12, 26:22-24. On this shift, Plaintiff's supervisor instructed him and Ronnie Courson, a senior machinist, to "change a power assembly on a [GE] Evo locomotive engine." Dkt. No. 26-1 at 28:14-15, 29:2-8. Plaintiff told his supervisor that neither he nor Mr. Courson had done the task before or received training on it. Id. at 28:16-23, 29:15-17; Dkt. No. 22-4 at 60:35-43, 61:22-62:9. The supervisor responded, "[j]ust do the best you can do." Dkt. No. 26-1 at 28:24-29:1.

Plaintiff asked another machinist about the task and what tools he would need. Id. at 30:25-31:14, 32:17-22; Dkt. No. 22-4 at 62:13-34. The machinist informed Plaintiff and Mr. Courson about the repair and the required tools. Id. at 31:18-32:11. GE technical advisors were also present that night. Id. at 29:22-30:4. Plaintiff could have asked the advisors for further advice on the repair but did not. Id. at 30:5-31:1, 44:11-15.

Plaintiff and Mr. Courson then began the repair. Id. at 32:12-33:3. While they were working, the supervisor directed Mr. Courson to perform a different task, leaving Plaintiff to work alone. Id. 33:8-34:6. While working alone, a gasket "bound up," which means it became "stuck" and "slanted from one side to the other." Id. at

43:9–23. The base gasket is "supposed to just slide," so a worker usually grabs it with their hands and slides it off the studs without the use of tools, but Plaintiff could not do this because the gasket was "bound up." Id. at 41:15–25, 43:9–44:6. The parties dispute whether Plaintiff "hit" or "applied pressure" to the gasket to try to unstick it, but taking reasonable inferences in favor of Plaintiff as the Court must on Defendant's motion for summary judgment, Plaintiff "applied pressure" to the gasket. See id. at 45:4–24 (Plaintiff stating that he "appl[ied] pressure on the back side of the gasket trying to get the level back up"); Dkt. No. 22-2 at 150 (Plaintiff's employee injury report stating "I hit [the] gasket to even it back out"); Dkt. No. 22-4 at 25:8–17 (Mr. Thoele—the Assistant Plant Superintendent—stating at CSX's investigatory hearing that Plaintiff "hit the gasket"); Dkt. No. 26-1 at 59:1–25 (Plaintiff denying that Mr. Thoele's account was accurate and maintaining that he "appl[ied] pressure" to the gasket); Dkt. No. 22-4 at 54:4–6 (Plaintiff stating at his hearing that he "appl[ied] pressure" to the gasket); Dkt. No. 22-3 ¶ 3 (Mr. Thoele stating that Plaintiff reported "he . . . attempted to dislodge the gasket by hitting it with the side of his right hand").

Plaintiff cut his hand on the gasket and needed medical attention. Dkt. No. 26-1 at 45:4–24, 53:3–19, 54:6–10. Plaintiff was the only person who witnessed the incident. Id. at 51:20–52:5.

Plaintiff immediately informed his managers, Bill Matlock and Scott Morgan, about the incident. Id. at 45:25–46:5. The managers determined that Plaintiff needed medical attention, and Mr. Matlock took him to the emergency room. Id. at 52:18–53:23, 60:12–18; see also Dkt. No. 26-2 at 25:3–10 (Mr. Gibbs, CSXT's Plant Manager and Shift Supervisor for its Waycross facility, explaining that "if [an employee] is injured and . . . leave[s] the property without reporting it, it [results in an] automatic dismissal"). On the way to the emergency room, Mr. Matlock asked Plaintiff what happened, and Plaintiff explained the incident. Dkt. No. 26-1 at 60:25–61:19. While Plaintiff was in the waiting room of the ER, Mr. Matlock further questioned Plaintiff to obtain a timeline of events. Dkt. No. 22-4 at 60:20–23; Dkt. No. 26-1 at 62:2–8.

After Plaintiff received treatment, Mr. Matlock drove Plaintiff back to the shop. Dkt. No. 26-1 at 62:15–17. At the shop, Mr. Thoele asked Plaintiff whether he was under the influence of medication and whether he could fill out an injury report. Dkt. No. 22-3 ¶¶ 1–2; Dkt. No. 22-4 at 62:43–63:4; Dkt. No. 22-4 at 51:8–12 (Mr. Matlock stating that the managers asked if Plaintiff "felt like filling out the form"). Plaintiff testified his managers "coached [him] into writing [the] statement," that he did not believe he had the option of declining and filling out the report later, and that he wrote it under duress. Dkt. No. 26-2 at 49:13–50:22 (Plaintiff stating that Mr. Thoele "coached" him and he

7

"didn't know exactly how to explain [the accident, so he] put down what [Mr. Thoele] told [him] to"); Dkt. No. 22-4 at 59:39-40 (Plaintiff stating "I used the word hit that night instead of push, because I was under duress"); id. at 70:10-13 (Plaintiff stating that he wrote the injury report statement "under duress" and the assumption that he "had to do it right then"); id. at 57:10-19 (same). Defendants contend that Plaintiff freely gave the statement. Id. at 29:1-26, 34:21-35:4 (Mr. Thoele stating that the managers "asked [Plaintiff] what happened, [Plaintiff] didn't have any objections"). Mr. Matlock and two other managers were present in the room while Plaintiff filled out the report. Dkt. No. 26-1 at 49:8-19; Dkt. No. 22-4 at 50:1-13, 52:19-41. At Mr. Thoele's instructions, Mr. Matlock entered an assessment, stating that Plaintiff "struck down on a metal gasket that was bound on PA studs." Dkt. No. 22-4 at 6; Dkt. No. 22-4 at 52:43-53:8.

Five weeks later, on July 19, 2018, Defendant issued Plaintiff a notice of investigation for "fail[ure] to take the safest course when replacing a gasket on equipment." Dkt. No. 22-2 at 155; Dkt. No. 22-4 ¶ 5. Under IDPAP, Plaintiff could receive a fifteen-day suspension or proceed to a hearing. Dkt. No. 22-4 ¶ 5. Plaintiff chose to participate in a hearing. Id. Thus, he subsequently received a letter notifying him of the charge and the date of the formal investigation. Dkt. No. 22-2 at 155. At the hearing, Mr. Gibson, a Union Representative, represented Plaintiff, and

Plaintiff was given the opportunity to cross-examine witnesses and present evidence. Dkt. No. 22-4 at 18–71.

At the hearing, Defendant contended that Plaintiff violated CSX Rule 104.1(3) and (5) and CSX Rule 2000.2(a) "by using his hand in place of a tool." Dkt. No. 22-4 at 27:36–28:19, 29:18–19. Mr. Thoele stated that he had investigated the incident, that Plaintiff could have safely removed the gasket using a number of different tools, and that he himself safely removed the gasket "us[ing] the handle of a 3/8th rachet." Dkt. No. 22-4 at 39:4–14. Mr. Gibson argued that Mr. Thoele's removal of the gasket constituted an improper use of a tool, which violated GE rules, but he provided no evidence to support this assertion. Dkt. No. 26-2 at 32:13–33:5 (Mr. Gibson explaining that Mr. Theole's reenactment violated the "tool use policy"); id. at 26:22–25 ("GE technical documents covering [the job Plaintiff was assigned] says that you're not to strike that gasket with any tools. You're to use your hands."); Dkt. No. 22-4 at 39:4–19 (Mr. Gibson stating at Plaintiff's disciplinary hearing "[t]hat isn't, that is not what a ratchet's designed for, Mr. Thoele. So you're openly admitting in this Hearing that you improperly used a hand tool.").[2] During the hearing, Mr. Gibson and Mr. Thoele had the following exchange:

---

[2] Plaintiff repeats this assertion but also does not provide evidence of this rule besides citing to Mr. Gibson's testimony. Dkt. No. 26 at 4.

- Mr. Gibson: If [Plaintiff] had not got injured, he would not be subjected to this Hearing today, would he?

- Mr. Thoele: That's a, would be [sic] an opinion.

- Mr. Gibson: No, it's not an opinion, it's a fact, Mr. Thoele. Why, let's rephrase the question. Why are we in this Hearing today?

- Mr. Thoele: Because [Plaintiff] violated a rule.

- Mr. Gibson: What led you to believe he violated a rule, Mr. Thoele?

- Mr. Thoele: That he used excessive force on the gasket.

- Mr. Gibson: And what drew attention to this, Mr. Thoele?

- Mr. Thoele: He reported that the gasket sliced his hand open.

- Mr. Gibson: So it was the result of an injury.

- Mr. Thoele: It was the result of a rules violation.

- Mr. Gibson: It was the result that he reported the injury that led to the Hearing ultimately, correct?

- Mr. Thoele: No, sir.

- Mr. Gibson: Mr. Thoele, you would not have been otherwise aware of it if he had not reported that injury. True or false?

- Mr. Thoele: If he'd have kept it to his self, no.

Dkt. No. 22-4 at 36:21-37:6. Plaintiff also acknowledged during the hearing that he could have used a hammer to tap the gasket

back in place, which would have "been safer" than using his hand. Dkt. No. 26-1 at 55:2-56:2.

After the hearing, Mr. Gibson requested Mr. Thoele drop the charges against Plaintiff, asking Mr. Theole, "Have you lost your damn mind? Do you understand that you're putting up the image that you're charging this man because he was injured? Do you understand what you're doing?" Dkt. No. 26-2 at 31:5-10. According to Mr. Gibson, Mr. Theole responded, "I don't care." Id. at 31:11. Mr. Gibson next contacted the regional mechanical superintendent and asked him to drop the charges against Plaintiff. Id. at 31:11-15. Mr. Gibson testified that the superintendent responded, "Hell, no . . . . They want frigging meat in the damn meat grinder, I'm going to feed the damn meat grinder." Id. at 31:16-18. Mr. Gibson responded, "You know, now you have a presumption that you're charging him based on the fact that he had an injury." Id. at 39:5-12. The superintendent stated, "I don't give a damn. They [want] meat throwed in the meat grinder. I'm going to feed the son of a bitch." Id. at 39:13-15.

Subsequently, the hearing officer reviewed the transcript and exhibits and determined that Plaintiff had violated CSX Rules 104.1 and 2000.2 for "fail[ing] to take the safest course when replacing a gasket on equipment." Dkt. No. 22-4 ¶ 5; Dkt. No. 22-4 at 73; Dkt. No. 22-4 at 27:36-39, 27:42-28:19. Rule 104.1 states:

When on duty, employees must:

1. Devote themselves exclusively to the service of CSX,

2. Assist and cooperate with other employees,

3. Perform duties in a safe and efficient manner that prevents unnecessary delay to customers,

4. Promptly report violations of the rules or special instructions to a supervisor, and

5. Take the safest course when conditions are not covered by [the] rule.

Dkt. No. 22-2 at 158 (Employee Operating Manual). Rule 2000.2 states: "When performing a task, employees must not: a. Use excessive force, or b. Place any part of the body where it could be pinched." Id. at 161. Following IDPAP rules, Plaintiff received a thirty-day suspension. Dkt. No. 22-4 ¶ 5; id. at 73. After his suspension, Plaintiff returned to work. Dkt. No. 22-4 ¶ 6.

**IV.  The extended break discipline.**

Approximately nine months after the gasket incident, on March 20, 2019, Plaintiff was working another third shift. Dkt. No. 22-6 ¶ 7. He was entitled to take a ten-minute break at 1:00 a.m. and a twenty-minute lunch break at 3:00 a.m. Id. Around 4:00 a.m., Plaintiff's supervisor observed Plaintiff and his coworker, Matt White, taking an extended break in a locomotive. Dkt. No. 22-5 ¶¶ 8-9. Plaintiff's supervisor reported that Plaintiff "appeared to be in a reclining position, sleeping." Id. ¶ 8. Plaintiff denies that he was sleeping, and taking inferences in his favor, the Court

12

credits this testimony. Dkt. No. 26-1 at 101:17–23. Plaintiff and Mr. White both admitted they had been in the locomotive cab for over an hour, approximately fifty-five minutes past their scheduled lunch time. Dkt. No. 22-5 ¶ 10; Dkt. No. 22-6 ¶¶ 9–10; Dkt. No. 26-1 at 100:7–12. Plaintiff admitted that he violated CSX's rules through his actions. Dkt. No. 26-1 at 103:25–104:3.

Mr. Gibbs entered an assessment against Plaintiff for "SLEEPING IN [A] CAB OF CSXT 3127" and for being "AWAY FROM WORK ASSIGNMENT FOR APPROX. 1 HOUR," which was classified as a non-major, serious offense. Dkt. No. 22-4 at 6; Dkt. No. 22-5 ¶¶ 17, 18. Both Plaintiff and Mr. White were subsequently charged with "not performing any work for over an hour." Dkt. No. 22-4 ¶¶ 7, 9; Dkt. No. 22-5 ¶ 18; Dkt. No. 22-6 ¶ 20. This is a lesser offense than sleeping on the job. Dkt. No. 22-5 ¶ 18; Dkt. No. 22-6 ¶ 20.

Defendant subsequently determined that Plaintiff violated Rule 100.1, which requires employees to "know and comply with rules, instructions, and procedures that govern their duties. They must also comply with the instructions of supervisors. Where there is uncertainty, employees must: 1. Take the safest course of action, and 2. Contact a supervisor for clarification." Dkt. No. 22-5 ¶ 15; Dkt. No. 22-4 ¶ 7. According to Plaintiff, Mr. Gibbs told Mr. White the night after Plaintiff was pulled out of service pending the investigation that "unfortunately, [Mr. White] was just caught up in the crosshairs." Dkt. No. 26-1 at 91:23–94:7.

13

Mr. Gibson later testified that employees are not usually formally disciplined for "sitting in [a] cab like that" and are instead usually told to get back to work "[a]nd that would have been the end of it." Dkt. No. 26-2 at 55:9-13.

Plaintiff was given a time-served suspension to reflect the time he spent out of service while the charges were pending against him, in accordance with IDPAP rules. Dkt. No. 22-4 ¶ 7; Dkt. No. 22-6 ¶ 26. Mr. White did not have any previous disciplinary actions in the prior three years, so he waived his right to a formal hearing and received a formal reprimand. Dkt. No. 22-4 ¶¶ 7, 9; Dkt. No. 22-6 ¶ 22.

## V. The resignation.

Plaintiff returned to work on May 10, 2019. Dkt. No. 22-4 ¶ 8; Dkt. No. 22-6 ¶ 27. When he returned to work, Plaintiff testified that he believed his managers were "constantly coming up, checking [his] work, being intimidating," "keeping tabs on [him]," and "constantly looking over his shoulder," and that he felt like he "was being bullied by them." Dkt. No. 26-1 at 86:12-91:12. Plaintiff's supervisors deny this. Dkt. No. 22-5 ¶¶ 27-32; Dkt. No. 22-6 ¶¶ 29-33.

Plaintiff testified that he decided to resign due to the constant scrutiny he felt. Dkt. No. 26-1 at 86:12-89:25. Mr. Gibson supports Plaintiff's account. Dkt. No. 26-2 at 54:25-55:24. Mr. Gibson testified that "it was obvious" why Defendant felt compelled

14

to resign since the managers "micromanag[ed]" Plaintiff, "harras[ed] him," and "[e]very time the man turned around, if he'd have slipped wrong, they were standing to charge him." Id. at 54:25-55:24. When Plaintiff resigned, he did not tell his supervisors and management why he resigned, but he told Mr. Gibson. Dkt. No. 26-1 at 84:13-19; Dkt. No. 26-2 at 54:10-56:3. On May 31, 2019, the night he was going to resign, Plaintiff went to use the restroom. Dkt. No. 26-1 at 95:8-10. According to Plaintiff, as soon as he reached the restroom, his manager called Plaintiff and said "Where are you at? . . . You know you're being watched, so you need to stay in your area." Id. at 95:8-96:12. Later in the shift, Plaintiff resigned. Dkt. No. 22-6 ¶ 28.

On September 28, 2019, Plaintiff timely filed a Federal Railroad Safety Act ("FRSA") retaliation complaint with the Secretary of Labor's Region IV OSHA Whistleblower Office ("SOL"). Dkt. No. 1 ¶ 32; see also 49 U.S.C. § 20109. Because the SOL had not issued a final ruling within the statutorily allotted time, Plaintiff was permitted to bring this action seeking de novo review. Dkt. No. 1 ¶¶ 34-37; see also 49 U.S.C. § 20109(d)(3) ("[I]f the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States, which shall have

jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury."). Plaintiff alleges that he engaged in protected activity when he reported his gasket-incident injury, and that Defendant took adverse actions against him in retaliation. Dkt. No. 1 ¶¶ 27-29. Plaintiff further alleges that his resignation amounted to constructive discharge. Id. ¶¶ 30-31.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). The Court must view all facts in the light most favorable to the non-moving party and draw all inferences in its favor. Tolan v. Cotton, 572 U.S. 650, 657 (2014).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the

Court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.

## DISCUSSION

To establish a prima facie case of FRSA retaliation, "a plaintiff must show 1) he engaged in protected activity, 2) the employer knew he engaged in said activity, 3) the employee suffered an adverse employment action, and 4) the protected activity was a 'contributing factor' in the adverse action." Grantham v. CSX Transp., Inc., No. CV 219-065, 2022 WL 677575, at *3 (S.D. Ga. Mar. 7, 2022) (citing 49 U.S.C. §§ 20109(d)(2), 42121). Once the

plaintiff bears his burden, the defendant may still be entitled to summary judgment in its favor if it can show "by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of the plaintiff's protected activity." Id. (alterations accepted) (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)). "Clear and convincing evidence is 'a conclusive demonstration, i.e., that the thing to be proved is highly probable or reasonably certain.'" Id. (quoting Lancaster v. Norfolk S. Ry. Co., ARB Case No. 2019-0048, 2021 DOL Ad. Rev. Bd. LEXIS 19, at *12 (Sept. 30, 2015)). Here, Defendant disputes only the fourth prong of Plaintiff's prima facie case—that "the protected activity was a 'contributing factor' in the adverse action." Id. (citing 49 U.S.C. §§ 20109(d)(2), 42121); Dkt. No. 22-1 at 12-19 (arguing that plaintiff cannot establish that his protected activity was a "contributing factor").

## I.   To satisfy the "contributing factor" requirement, a plaintiff must show intentional retaliation.

At the outset, the parties disagree whether the "contributing factor analysis" requires that a plaintiff show "intentional retaliation." Grantham, 2022 WL 677575, at *5; Dkt. No. 22-1 at 10-12 (Defendant arguing that the intentional retaliation standard applies); Dkt. No. 26 at 10-13 (Plaintiff arguing that an FRSA plaintiff need not prove intentional retaliation); Dkt. No. 28 at

2-4 (Defendant arguing that the intentional retaliation standard applies).

This Court recently held that "[t]he intentional retaliation standard is the correct standard to apply" in FRSA retaliation cases. Grantham, 2022 WL 677575, at *5. In so holding, the Court recognized that Congress drafted the FRSA anti-retaliation provision to be plaintiff-friendly, but its "causation standard must have a limit—it cannot be that Congress intended to protect a railroad worker against *any* misconduct, simply by virtue of that worker committing it shortly before or after engaging in protected activity." Id. Thus, the Court rejected the rationales underlying the so-called chain-of-events or inextricably intertwined theories and held that "an employee must prove 'retaliatory animus'" "to satisfy the 'contributing factor' aspect of FRSA's anti-retaliation statute." Id. (collecting cases); see also Yowell v. Admin. Rev. Bd., U.S. Dep't of Lab., 993 F.3d 418, 423 (5th Cir. 2021) (explaining and rejecting the "chain-of-events" and "inextricably intertwined" theories). This reasoning still holds, and Plaintiff's arguments to the contrary are unavailing.

Plaintiff correctly notes that the 11th Circuit has not yet addressed whether an FRSA claim requires retaliatory animus or intentional retaliation. Dkt. No. 26 at 9; cf. Grantham, 2022 WL 677575, at *4 ("The Eleventh Circuit has not yet decided the issue,

but it has been addressed in a number of other circuits.") .[3] The Court should not apply the intentional retaliation standard, Plaintiff argues, because the Eleventh Circuit has held that a Title VII retaliation plaintiff may establish causation "by showing a very close temporal proximity between the protected activity and the adverse employment action"—without the need to show intentional retaliation. Dkt. No. 26 at 9–10 (citing Carman v. Cent. of Ga. R.R. Co., No. 4:18-CV-203, 2020 WL 4574492, at *5 (M.D. Ga. Aug. 7, 2020)). This argument overlooks (1) the Court's own precedent applying the intentional retaliation standard to an FRSA claim and (2) the Eleventh Circuit's application of the intentional retaliation standard in the analogous AIR-21[4] context.

As an initial matter, Plaintiff points to no intervening Eleventh Circuit decision or new considerations that have arisen since the Court's Grantham decision. See generally Dkt. No. 26 at 8–13. Furthermore, Congress borrowed the FRSA framework from the AIR-21 statute. See 49 U.S.C. § 20109(d)(2)(A) ("Any action under [the FRSA] shall be governed under the rules and procedures set

---

[3] The Supreme Court has also granted certiorari to evaluate whether a whistleblower must prove "retaliatory intent" under Sarbanes-Oxley Act as part of his case-in-chief, which requires that a whistleblower shows that his protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." See Murray v. UBS Sec., LLC, 43 F.4th 254, 258 (2d Cir. 2022), cert. granted, 2023 WL 3158354 (U.S. March 20, 2023) (No. 22-660).

[4] The Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21").

forth in section 42121(b) [AIR-21].”); 49 U.S.C. § 42121(b)(B)(i)-
(iv) (AIR-21 defining the parties' burdens and requiring that the
complainant make a prima facie showing that their protected
behavior was “a contributing factor if the unfavorable personnel
action alleged in the complaint”). In Majali v. U.S. Department of
Labor, 294 F. App'x 562, 567 (11th Cir. 2008), an AIR-21 case, the
Department of Labor Administrative Review Board (ARB) and the
administrative law judge (“ALJ”) had accepted the respondent's
non-retaliatory reason for firing the petitioner. In a non-binding
opinion, the Eleventh Circuit found that this acceptance meant
that “the ALJ and Board found that petitioner had not proved that
his protected activity was a ‘contributing factor' to the decision
to fire him.” Id. Thus, the court implicitly adopted the
intentional retaliation standard in the AIR-21 context because it
required retaliatory intent to show that protected activity was a
“contributing factor.” Id. Because the FRSA explicitly adopts the
AIR-21 framework, while non-binding, the Majali decision indicates
that the intentional retaliation standard also applies to the FRSA.

Plaintiff's Title VII argument is also unavailing. The Title
VII framework and causation standard differ from that of the FRSA
and AIR-21. To establish causation for a Title VII retaliation
claim, a plaintiff must show that the “protected activity was a
but-for cause of the alleged adverse action by the employer.” Gogel
v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1135 (11th Cir.

2020) (quoting <u>Univ. of Tx. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 362 (2013)). The FRSA and AIR-21, instead, require a plaintiff to show that "the protected activity was a 'contributing factor' in the adverse action." <u>Grantham</u>, 2022 WL 677575, at *3. Thus, the "causation standard is lower in FRSA cases than in Title VII cases." <u>Id.</u> at *3 n.3.

Intuitively, it seems as if an FRSA plaintiff should be able to create a genuine issue of material fact through "very close temporal proximity," as Plaintiff argues. Dkt. No. 26 at 9–10. At first glance, if (1) the FRSA causation is lower than Title VII and (2) a Title VII plaintiff may create a genuine issue on causation by demonstrating "very close temporal proximity," then (3) an FRSA plaintiff should be able to do so as well, if not with even less temporal proximity. This logic, however, is misleading because it fails to consider the relative probative value of temporal proximity in Title VII and FRSA contexts.

A Title VII retaliation plaintiff argues that she faced retaliation for complaining about employment discrimination based on color, religion, sex, or national origin. <u>See</u> 42 U.S.C. §§ 2000(e)(2)(a)–(c), (3)(a). A Title-VII-retaliation plaintiff's typical job duties do not involve reporting employment discrimination the employer has committed against her. As such, when a plaintiff undertakes a Title VII protected activity and then faces a material adverse action in "very close temporal

proximity," the probative value of that evidence is high enough that a reasonable juror could infer that the complaint was the but-for cause of the adverse action. See, e.g., Carman, 2020 WL 4574492, at *5.

In contrast, an FRSA retaliation plaintiff argues that she has faced retaliation for (1) providing information or assisting in an investigation about conduct she reasonably believed violated laws, rules, or regulations; (2) refusing to violate or assist in violating laws, rules, or regulations; (3) filing a complaint, causing a proceeding to be brought, or testifying in a railroad safety or security proceeding; (4) "notify[ing], or attempt[ing] to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee"; (5) "[c]ooperat[ing] with a safety or security investigation by the Secretary of Transportation, the Secretary of Homeland Security, or the National Transportation Safety Board"; (6) "furnish[ing] information to . . . any Federal, State, or local regulatory or law enforcement agency as to the facts relating to any accident or incident resulting in injury or death to an individual or damage to property occurring in connection with railroad transportation"; or (7) "accurately report[ing] hours on duty." 49 U.S.C. §§ 20109(a)(1)-(7).

As the Administrative Review Board ("ARB") and this Court have noted, "most of an employee's job may consist of protected

activity." <u>Grantham</u>, 2022 WL 677575, at *5 (quoting <u>Acosta v. Union</u>
<u>Pac. Ry. Co.</u>, ARB Case No. 2018-0020, at *8 (Jan. 20, 2020)). Thus,
temporal proximity between an employee's FRSA-protected activity
and an adverse action are of "limited causal value." <u>Id.</u> (quoting
<u>Acosta</u>, ARB Case No. 2018-0020, at *8). If an FRSA retaliation
claim could prevail based on temporal proximity alone, that would
mean a railroad worker would be "protect[ed] . . . against *any*
misconduct, simply by virtue of that worker committing it shortly
before or after engaging in protected activity." <u>Id.</u>; <u>see also</u>
<u>Yowell</u>, 993 F.3d at 427 ("Under the FRSA, when an employee engages
in a protected activity such as reporting a workplace injury, that
employee is not insulated from what would otherwise be appropriate
discipline for misconduct that becomes known to the employer at
that time or during the course of the employer's addressing the
protected activity. In simple terms, a protected activity does not
by itself shield an employee from the ramifications of workplace
misconduct."). This, the Court has concluded, "cannot be [what]
Congress intended." <u>Grantham</u>, 2022 WL 677575, at *5. Thus, the
difference in the probative value of temporal proximity with regard
to a Title VII versus an FRSA claim explains why temporal proximity
may be sufficient to satisfy the higher Title VII causation
requirement but not the lower FRSA causation requirement.

 As such, Plaintiff's argument fails, and this Court will
continue to follow its own precedent as well as the Second, Fourth,

Sixth, Seventh, and Eighth Circuits and apply the intentional retaliation standard. Tompkins v. Metro-N. Commuter R.R. Co., 983 F.3d 74, 82 (2d Cir. 2020) ("Having now considered the issue, we agree with the Seventh and Eighth Circuits and hold that some evidence of retaliatory intent is a necessary component of an FRSA claim."); Lowery v. CSX Transp., Inc., 690 F. App'x 98, 101 (4th Cir. 2017) (holding that the appellant showed his protected activities were a contributing factor because the facts supported "an inference of retaliatory animus"); Lemon v. Norfolk S. Ry. Co., 958 F.3d 417, 420 (6th Cir. 2020) ("Th[e] chain-of-events theory of causation suffers from two problems: It does too much, and it does too little."); Consol. Rail Corp. v. U.S. Dep't of Lab., 567 F. App'x 334, 338 (6th Cir. 2014) (holding that, as to causation, there was "substantial evidence that animus was a contributing factor in Bailey's termination"); Armstrong v. BNSF Ry. Co., 880 F.3d 377, 382 (7th Cir. 2018) ("A showing of discriminatory animus, which the [FRSA] requires, necessarily includes some proof of retaliatory motive."); Holloway v. Soo Line R.R. Co., 916 F.3d 641, 644 (7th Cir. 2019) ("Our caselaw is clear that a plaintiff alleging retaliation in violation of § 20109(a)(4) cannot point only to the sequence of events—an injury report followed by a later dismissal—to show that the complaint was a contributing factor in the adverse employment action."); Kuduk v. BNSF Ry. Co. ("Kuduk I"), 768 F.3d 786, 791 (8th Cir. 2014) ("[T]he

essence of [the FRSA retaliation] intentional tort is 'discriminatory animus.'" (citation omitted)); Dakota, Minn. & E. R.R. Corp. v. U.S. Dep't of Lab. Admin. Rev. Bd., 948 F.3d 940, 945–47 (8th Cir. 2020) (holding that the ARB's determination below that the Eighth Circuit erred in Kuduk I "is both contrary to our governing precedents and fatally flawed"); see also Aymond v. Nat'l R.R. Passenger Corp., ARB Case No. 2018-FRS-00006, at *12 (April 26, 2018) ("While the contributing factor standard does not require the employee 'conclusively demonstrate the employer's retaliatory motive,' it does require that the employee prove 'intentional retaliation prompted by the employee engaging in protected activity.'" (quoting Kuduk I,768 F.3d at 791)).

## II.  Plaintiff presents a prima facie case of FRSA retaliation.

As mentioned, Defendant disputes only the "contributing factor" element of Plaintiff's prima facie case. Dkt. No. 22-1 at 12–19; Dkt. No. 28 at 1–10. Here, Plaintiff points specifically to two retaliatory adverse actions—the charges for both the 2018 gasket incident and the 2019 extended break incident. Dkt. No. 26 at 9, 14–15. Plaintiff successfully presents sufficient evidence of retaliatory animus as to both contested disciplinary actions to survive summary judgment. See Grantham, 2022 WL 677575, at *5 (endorsing the view that, "to satisfy the 'contributing factor' aspect of FRSA's anti-retaliation statute, an employee must prove 'retaliatory animus'" (quoting Lowery, 690 F. App'x at 101)).

26

To clarify, Plaintiff admits his conduct underlying the purported rule violations (except he urges that he "applied pressure" to the gasket instead of hitting it) and does not contend that Defendant fabricated accounts of his underlying conduct. See, e.g., Dkt. No. 26 at 2–5. As for the 2018 gasket incident, Plaintiff admits that if he "had used a hammer to tap [the gasket] back in place . . . [he] would not have cut [his] hand" and "it would have been safer" to do so. Dkt. No. 22-2 at 55:2–56:2. But see id. (contending that using a hammer would have been a different rule violation). And for the 2019 extended break disciplinary action, Plaintiff admits that he stayed in the locomotive cab longer than permitted. Dkt. No. 22-2 at 100:7–102:18. Further, Plaintiff does not contend that his 2017 charge for sleeping on a locomotive was retaliation or related to his two subsequent disciplinary actions. See generally Dkt. No. 26. Instead, Plaintiff argues that Defendant's *discretionary decision to charge him* with rule violations in 2018 (the gasket incident) and 2019 (the extended break) based on that underlying conduct was retaliation for his injury report. Id.

### a. Plaintiff establishes causation for the 2018 gasket incident.

Plaintiff presents enough evidence to create a genuine issue of material fact as to causation for the gasket incident. To begin, Plaintiff argues that "[b]y [Defendant's] own admission in the investigatory hearing, had Plaintiff not reported that he had

27

injured his hand, they would not be at the investigatory hearing," citing Mr. Gibson's testimony recalling what Mr. Thoele said at Plaintiff's disciplinary hearing. Dkt. No. 26 at 9 (citing Dkt. No. 26-2 at 33:13–23). This recollection is contradicted by the hearing transcript. That is, Mr. Thoele repeatedly testified that Plaintiff was disciplined because he violated a rule and acknowledged that if Plaintiff had not reported his injury, he would not have otherwise become aware of it. Dkt. No. 22-4 at 36:21–37:6.

True, Plaintiff would not have been charged with "failure to take the safest course" had he not reported his injury because Defendant would not have become aware of the injury. But, as discussed supra pp. 19–27, this "chain-of-events" or "inextricably intertwined" reasoning, without more, is insufficient to survive summary judgment. Cf. Dakota, 948 F.3d at 945 ("We expressly rejected the contention that, when an employer learns about an employee's conduct warranting discipline in a protected injury report, the report and the discipline are 'inextricably intertwined' and this factual connection is 'sufficient to establish the contributing-factor element of his prima facie case.'"); Dkt. No. 22-1 at 14 (arguing that Plaintiff cannot prevail on his claim if his only causation evidence is that Defendant "would not have learned of his rule violation if he had not filed an injury report, and he cannot prevail on that basis").

28

Plaintiff, however, also presents evidence of retaliatory animus in the form of Mr. Gibson's testimony.

Mr. Gibson's testimony creates a genuine issue of material fact as to causation. Mr. Gibson testified that when he asked CSX's regional mechanical superintendent to drop the charges against Plaintiff, the superintendent responded, "Hell, no . . . They want frigging meat in the damn meat grinder, I'm going to feed the damn meat grinder." Dkt. No. 26-2 at 31:11–18. When Mr. Gibson responded, "[y]ou know, now you have a presumption that you're charging him based on the fact that he had an injury," the superintended allegedly stated, "I don't give a damn. They [want] meat throwed in the meat grinder. I'm going to feed the son of a bitch." Id. at 39:5–15. While a jury can choose whether to believe this testimony, the Court must do so at summary judgment. A reasonable juror could infer from Mr. Gibson's testimony that Defendant was motivated to discipline Plaintiff because it wanted to blame and punish someone for the accident—it wanted "meat" in the "meat grinder."

The ARB has cautioned,

> [w]e have said it many a time before, but we cannot say it enough: "A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" We want to reemphasize how low the standard is for the employee to meet, how "broad and forgiving" it is. "Any" factor really means any factor. It need not be "significant, motivating, substantial or predominant"—it just needs to be a factor. The protected activity need only play some

29

role, and even an "insignificant" or "insubstantial" role suffices.

Palmer v. Canadian Nat'l Ry./Ill. Cent. R.R. Co., ARB Case No. 16-035, 2016 WL 5868560, at *31 (Sept. 30, 2016) (alterations accepted) (citations omitted). Thus, while Defendant's decision to discipline Plaintiff could have been motivated in part by a belief that he violated the rule, Mr. Gibson's testimony indicates that retaliatory animus played "some role" in its decision. Id. at *31; see also id. at 37 (Royce, J., concurring in part and dissenting in part) ("[A]s the ARB has ruled countless times, a complainant can prevail by showing that the respondent's 'reason, while true, is only one of the reasons for its conduct.'" (citation omitted)). This is sufficient to establish a genuine issue related to causation.

Defendant argues that Plaintiff cannot show causation because he was not "improperly charged without a factual basis," which renders Mr. Gibson's testimony "irrelevant." Dkt. No. 28 at 8 n.2; Dkt. No. 22-1 at 14. This is not so. Here, Plaintiff was charged with the violation of a vague rule—requiring employees to perform in a "safe and efficient manner" and "take the safest course"—which could cover a vast range of situations and implicate at least some degree of supervisory enforcement discretion. Dkt. No. 22-2 at 158; see also Echols v. Grand Trunk W. Ry., Co., ARB No. 16-022, ALJ No. 2014-FRS-49, 2017 WL 4736893, at *2-5 (ARB Oct. 5,

2017) (affirming summary judgment for the defendant and noting that the ALJ found the applicable rule was "not vague or subject to manipulation and use as pretext for unlawful discrimination"); DeFrancesco v. Union R.R. Co., ARB Case No. 13-057, ALJ No. 2009-FRS-009, 2015 WL 5781070, at *7 (Sept. 30, 2015) (applying "OSHA's policy guidelines" to its analysis of the case, including that "[t]he nature of the rule cited by the employer should . . . be considered" because "[v]ague rules, such as a requirement that employees 'maintain situational awareness' or 'work carefully' may be manipulated and used as a pretext for unlawful discrimination"); Dkt. No. 26-4 (OSHA guidance stating: "The nature of the rule cited by the employer should also be considered. Vague rules, such as a requirement that employees 'maintain situational awareness' or 'work carefully' may be manipulated and used as a pretext for unlawful discrimination. Therefore, where such general rules are involved, the investigation must include an especially careful examination of whether and how the employer applies the rule in situations that do not involve an employee injury. Enforcing a rule more stringently against injured employees than noninjured employees may suggest that the rule is a pretext for discrimination against an injured employee in violation of section 11(c) or FRSA"). As such, although Plaintiff admitted the conduct underlying his charge, if Defendant does not enforce these broad rules in a sufficiently uniform and structured way, a manager could

31

potentially be influenced by the presence or absence of retaliatory motive when determining whether an incident merits a charge. Therefore, Mr. Gibson's testimony—which indicates that Defendant harbored retaliatory intent—is relevant. See Fed. R. Evid. 401 ("Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Defendant further urges that Mr. Gibson's testimony is "hyperbolic," "speculation," and "not probative evidence." Dkt. No. 28 at 8 n.2. For the reasons just discussed, Mr. Gibson's testimony is probative evidence—his testimony makes it more probable that Defendant's actions were motivated by retaliatory intent. Additionally, by simply labeling Mr. Gibson's testimony hyperbole and discrediting it, the Court would be making a credibility judgment, which it may not do on summary judgment. See, e.g., Wate v. Kubler, 839 F.3d 1012, 1018, 1021 (11th Cir. 2016) (explaining that the court must not make credibility determinations on summary judgment). Moreover, the Court must draw all reasonable inferences in the nonmovant's favor on summary judgment. Id. Taken in context, a jury could reasonably infer that the superintendent's "feed the meat grinder" comments—stated in *direct response* to Mr. Gibson asking to have the gasket incident charges against Plaintiff dropped—refer to management's desire to have someone punished for the gasket incident. Dkt. No. 26-2 at

31:11–39:15. Thus, this inference is not solely "speculation" about what the comment meant. See Dkt. No. 28 at 8 n.2.

Again, the jury need not credit Mr. Gibson's testimony or find that the "feed the meat grinder" comments indicate retaliatory intent. But a reasonable jury could do so. This is further supported by Plaintiff's testimony that his managers "coached" him when writing his injury report statement and that he did not know he had the option to write his statement later. Dkt. No. 26-2-6 at 49:13–50:2; Dkt. No. 22-4 at 57:10–19, 59:39–40, 70:10–13. While the managers deny this, Defendant also argues that Plaintiff's testimony shows its actions could not have been retaliatory because it *encouraged* him to write an official report. Dkt. No. 22-1 at 15. But the FRSA does not apply only to official injury reports—by its plain language, it applies to any employee's act done "to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee." 49 U.S.C. § 20109(a)(4). By immediately informing his managers about his injury, dkt. no. 26-1 at 45:25–46:5, Plaintiff performed an act protected from retaliation under the FRSA because he "attempt[ed] to notify[] the railroad carrier . . . of [his] work-related personal injury," 49 U.S.C. § 20109(a)(4). Thus, that Plaintiff's managers told him to write his injury report does not undermine that Defendant might have been motivated by retaliatory intent when it later disciplined

Plaintiff. Drawing inferences in Plaintiff's favor, as the Court must, that Plaintiff's managers "coached" his injury report statement supports that his injury report was a "contributing factor" in the later adverse employment action, because it could reasonably indicate that Defendant sought to advance a particular narrative that would justify its decision to discipline Plaintiff.

As a result, Plaintiff has demonstrated a genuine issue of material fact as to causation for the gasket incident discipline, thereby satisfying his prima facie case of retaliation as to that discipline. The Court next examines Plaintiff's claim that the extended break discipline constitutes FRSA retaliation. For similar reasons, Plaintiff satisfies his prima facie case as to that claim as well.

### b. Plaintiff establishes causation for the 2019 extended break.

Taking inferences in favor of Plaintiff and crediting Mr. Gibson's testimony, Plaintiff demonstrates a genuine issue of material fact as to his 2019 discipline for taking an extended break. Mr. Gibson testified that it was unusual for an employee to be formally disciplined for "sitting in a cab" as Plaintiff did. Dkt. No. 26-2 at 55:9-13. According to Mr. Gibson, employees are usually told to get back to work without further repercussions, id., but Plaintiff was formally charged and punished, dkt. no. 22-4 ¶ 7; dkt. no. 22-6 ¶ 26.

Defendant argues it is undisputed that Plaintiff and his coworker took a longer break than permitted, so its actions could not be retaliatory. Dkt. No. 22-1 at 18-19. However, as with the gasket incident discipline, if Defendant does not routinely punish employees for taking extended breaks, then Defendant's actions could still be retaliatory. See supra pp. 41-47. Further, Mr. Gibson testified that Plaintiff's managers "micromanag[ed]" and "harras[ed]" him, and "[e]very time the man turned around, if he'd have slipped wrong, they were standing to charge him." Dkt. No. 26-2 at 54:25-55:24. Crediting Mr. Gibson's testimony, Defendant scrutinized Plaintiff's activities, waited for the opportunity to charge him, and then disciplined Plaintiff for an activity that Defendant does not usually punish. This raises a reasonable inference of retaliatory intent and indicates that Plaintiff's injury report played "some role," no matter if it was an "insignificant or insubstantial" role, in Defendant's decision to discipline Plaintiff for taking an extended break. Palmer, ARB Case No. 16-035, at *31 (alterations accepted) (citations omitted).

Defendant next argues several factors demonstrate that there is no evidence of retaliatory intent. First, Defendant notes the lack of temporal proximity between Plaintiff's injury report and the extended break discipline because Plaintiff filed his FRSA complaint about five months prior. Dkt. No. 22-1 at 17 (first

citing Kuduk v. BNSF Ry. Co. ("Kuduk II"), 980 F. Supp. 2d 1092,
1101 (D. Minn. 2013), aff'd, Kuduk I, 768 F.3d 786; and then citing
Lawery v. Kroger Co., No. 2013-FDA-00001, slip op. at 39 (ALJ Aug.
12, 2015)). Defendant argues these cases show that "significantly
shorter time gaps" than Plaintiff's "have been found to undermine
any inference of causation" because they were not considered to
have sufficient temporal proximity. Id. This is not accurate. The
cases Defendant cites refer to instances where the plaintiffs
offered no evidence of a causal connection besides temporal
proximity or attempted to use temporal proximity to further support
a retaliation claim. See Kuduk II, 980 F. Supp. 2d at 1101
("Reliance on *temporal proximity will not support a retaliation
claim* under FRSA when the conduct for which the employee was
disciplined had long been established as a violation of the
employer's rules of conduct or the employee had been previously
counseled for performance deficiencies. Further, a plaintiff
cannot establish a prima facie case of retaliation *based on
temporal proximity alone* when the termination occurred two months
after the alleged protected conduct." (emphasis added) (citations
omitted)); Lawery, No. 2013-FDA-00001, slip op. at 39 (explaining
that there was no evidence of a causal connection between the
protected activity and termination and noting that there was no
temporal proximity). In this case, in contrast, both Plaintiff's
testimony and Mr. Gibson's testimony provide circumstantial

36

evidence supporting a causal connection apart from any considerations of temporal proximity.

Defendant also emphasizes that it could have punished Plaintiff more harshly than it did. Dkt. No. 22-1 at 19. While Plaintiff disputes that he was sleeping in the locomotive cab in 2019 when his manager found him, dkt. no. 26-1 at 101:17-23, and the Court treats this testimony as true, his manager entered an assessment saying that he was sleeping, dkt. no. 22-4 at 6 ("EMPLOYEE WAS OBSERVED SLEEPING IN CAB OF CSXT 3127."). As a result, if Defendant had wanted to retaliate against Plaintiff, it could have pursued a charge for sleeping in a locomotive, a more serious offense. Dkt. No. 22-5 ¶ 18; Dkt. No. 22-6 ¶ 20. Instead, it charged Plaintiff with the lesser offense of "not performing any work for over an hour." Dkt. No. 22-4 ¶¶ 7, 9.; Dkt. No. 22-5 ¶ 18; Dkt. No. 22-6 ¶ 20. Moreover, IDPAP authorizes Defendant to terminate an employee upon a third non-serious offense. Dkt. No. 22-4 at 14 (2018 rules, in effect at the time of the extended break discipline). Thus, if Defendant had desired to retaliate against Plaintiff, it could have attempted to fire him after the extended break incident. Instead, Defendant assessed a time-served sentence. Dkt. No. 22-4 ¶ 7; Dkt. No. 22-6 ¶ 26; see also Dkt. No. 22-4 at 15 ("In cases where employee was out of service in excess of (5) days [for a third subsequent non-major offense] and discipline is less than dismissal, Time-served will be

assessed."). That Defendant decided to treat Plaintiff less harshly than it could have under IDPAP weighs against a finding of retaliatory intent. Defendant's evidence, however, does not nullify Mr. Gibson's testimony. Dkt. No. 26-2 at 54:25–55:24. Instead, it demonstrates that there is a genuine issue of material fact suitable for the jury's evaluation.

In summation, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Plaintiff's injury report was a "contributing factor" in Plaintiff's two disciplinary actions at issue. Grantham, 2022 WL 677575, at *3 (citing 49 U.S.C. §§ 20109(d)(2), 42121). Thus, Plaintiff has presented a prima facie case of FRSA retaliation, and the burden shifts to Defendant to show, "by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of the plaintiff's protected activity." Id. (alterations accepted) (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)). In that regard, Defendant fails as to both the gasket-incident discipline and the extended-break discipline.

**III. Defendant fails to carry its burden as to both adverse actions.**

The ARB has emphasized that "[i]t is crucial to understand that the second step [in the FRSA retaliation analysis] involves a factual question that is distinct from the first." Palmer, ARB Case No. 16-035, at *12. Whereas the first step asks whether the

38

plaintiff's protected conduct was a contributing factor in the adverse action, the second step asks whether the defendant would have taken the same adverse action in the absence of the plaintiff's protected activity. Id. Further, "[i]t is not enough for the employer to show that it *could* have taken the same action; it must show that it *would* have." Id. at *33.

Clear and convincing evidence means evidence that makes it "highly probable" that the defendant would have taken the same adverse action even without the plaintiff's protected activity. Id. The "clear and convincing" standard is higher than "preponderance of the evidence" but lower than "beyond a reasonable doubt." Id. "Quantified, the probabilities might be in the order of above 70%." Id. (citation omitted). While the "clear and convincing" evidence standard requires more than a preponderance of the evidence, it "is a 'demanding but not insatiable' standard." Nejad v. Att'y Gen., State of Ga., 830 F.3d 1280, 1289 (11th Cir. 2016) (quoting Bishop v. Warden, GDCP, 726 F.3d 1243, 1258 (11th Cir. 2013)).

Defendant argues it has satisfied its burden as to both incidents because (1) it presented evidence that it had charged other employees for violation of "safety rules"; (2) Plaintiff was previously disciplined for sleeping on a locomotive; and (3) Mr. White, Plaintiff's coworker who was also found taking an extended break in 2019, was charged and disciplined for the same offense as

Plaintiff. Dkt. No. 22-1 at 19–21; Dkt. No. 28 at 10–12. Defendant fails to present clear and convincing evidence as to both incidents.

### a. Defendant does not carry its burden as to the 2018 gasket incident.

Defendant does not present clear and convincing evidence that it would have taken the same disciplinary action related to the gasket incident absent Plaintiff's injury report. To support its case, Defendant points to the declaration of Katrina Donovan, CSX's Senior Manager of Arbitration. Dkt. No. 22-1 at 20–21; Dkt. No. 28 at 11–12; Dkt. No. 22-4 ¶¶ 1, 10. Ms. Donovan submitted a declaration, stating in part:

> In 2018 and 2019, CSXT disciplined 70 employees (24 of whom were machinists) in the Jacksonville Division for various safety rule violations, including Rule 104.1, the Rule under which [Plaintiff] was disciplined, and Rule 100.1, which is a very similar safety rule. . . . Only four of the 70 employees who were disciplined for safety rule violations had reported an injury within one year prior to being charged with a rule violation. Of the four employees who reported injuries within one year prior to being charged, only three employees were machinists, including [Plaintiff]. Both of the other two machinists were disciplined for sleeping on the job, which is neither a Rule 104.1 violation nor a Rule 100.1 violation. Therefore, in 2018 and 2019, [Plaintiff] was the only machinist disciplined by CSXT for violation of Rules 104.1 or 100.1 who sustained an injury within the one-year timeframe preceding his Rule violation. Stated another way, including the two machinists disciplined for sleeping on the job, 21 of the 24 machinists disciplined for safety rule violations in 2018 and 2019 had not reported an injury within one year of the rule violation.

Dkt. No. 22-4 ¶ 10. Defendant argues that this evidence shows it "consistently enforced its written policies and assessed the same discipline to other employees who violated similar rules." Dkt. No. 28 at 11; Dkt. No. 22 at 20-21.

However, Ms. Donovan's statement contains ambiguities. Cf. Dkt. No. 26 at 15 ("[B]y [Defendant's] own admission[], [it] cannot point to a single individual that was charged with the same rule violation. Ms. Donovan states that Plaintiff was charged with violation of Rule 104.1, but lumps into her declaration individuals who were charged with Rule 100.1. CSX produced no evidence of any single individual charged with violations of 104.1, other than Plaintiff."). First, Ms. Donovan defines a set of employees: seventy employees, including twenty-four machinists, who were disciplined "for various safety rule violations, including Rule 104.1 . . . and Rule 100.1." Dkt. No. 22-4 ¶ 10. Then, she delineates a subset: "[o]nly four of the 70 employees *who were disciplined for safety rule violations* had reported an injury within one year prior to being charged with a rule violation." Id. (emphasis added). Then she creates another subset, still contained within the greater sets: of the four employees *who were disciplined for safety rule violations* and *reported an injury within one year prior to being charged*, only three were machinists, including Plaintiff. Id. (emphasis added). Thus, at this point in her analysis, we have three employees who (1) were disciplined for

41

safety rule violations, (2) reported an injury within one year prior to being charged, and (3) were employed as machinists. Id.

Her next statement muddies the analysis. She states that "[b]oth of the other two machinists"—who were disciplined for safety rule violations and reported an injury within one year prior to being charged—"were disciplined for sleeping on the job, which is neither a Rule 104.l violation nor a Rule 100.1 violation." Id. "Therefore," she concludes, "in 2018 and 2019, [Plaintiff] was the only machinist disciplined by CSXT for violation of Rules 104.1 or 100.1 who sustained an injury within the one-year timeframe preceding his Rule violation." Id. She explains: "[s]tated another way, including the two machinists disciplined for sleeping on the job, 21 of the 24 machinists disciplined for safety rule violations in 2018 and 2019 had not reported an injury within one year of the rule violation." Id. This indicates that Ms. Donovan includes in her analysis other rules (besides Rules 104.1 and 100.1) she categorizes as "safety" rules. This makes sense because she states, "[i]n 2018 and 2019, CSXT disciplined 70 employees (24 of whom were machinists) in the Jacksonville Division for various safety rule violations, *including* Rule 104.1, the Rule under which [Plaintiff] was disciplined, and Rule 100.1, which is a very similar safety rule." Id. (emphasis added). The word "includ[ing]," while commonly misused, suggests that "all of the components are [not] listed." Tex. L. Rev., Manual on Usage & Style

70 (15th ed. 2020). Thus, Ms. Donovan seems to have considered other rules she classifies as "safety rules" beyond Rule 104.1 and Rule 100.1.

This points to an important ambiguity: how Ms. Donovan classifies the rules as "safety rules." Some of these rules, like Rule 100.1, may be similar to Rule 104.1 in that they require employees generally to "take the safest course." Dkt. No. 22-4 ¶ 10. This could provide a relevant benchmark for judging whether Defendant routinely enforces such rules against employees even absent injury reports. Some of the rules, however, may be much more specific. It may require less discretion to determine whether an employee violated a specific safety rule than a general rule requiring an employee to "take the safest course." Id.

For example, Rule 100.3 states, "[w]hen on duty, employees must have the rule books and special instructions that are in effect available for use." Dkt. No. 22-2 at 160. This could be categorized as a "safety rule" because following the rules could be important for an employee to maintain a safe work environment. And this rule is more specific and thus seems to allow less discretion than Rule 104.1; an employee who left the relevant rule book at home, for example, would clearly violate that rule. As this example illustrates, if rules Ms. Donovan categorizes as "safety rules" differ significantly in their level of generality, data on the number of employees charged with any safety rule

violation would be a less probative metric than data on the number of employees charged with violation of rules like Rule 104.1 that are so general as to allow a high level of discretion.

Even if Ms. Donovan relied only on Rules 104.1 and 100.1, ambiguity remains. These rules contain multiple subparts, only one of which refers to the "safest course" or "safe course." Dkt. No. 22-2 at 158 (Rule 104.1 also requiring employees: "[d]evote themselves exclusively to the service of CSX," "[a]ssist and cooperate with other employees," "[p]erform duties in a safe and efficient manner that prevents unnecessary delay to customers," "[p]romptly report violations of the rules or special instructions to a supervisor"); id. at 160 (Rule 100.1 also requiring employees "[c]ontact a supervisor for clarification" if there is "uncertainty"). The other subparts are unrelated to this requirement, and Ms. Donovan did not specify whether the employees were charged with the relevant subsections when explaining her findings. Dkt. No. 22-4 ¶ 10.

Thus, while Ms. Donovan's declaration might support that Defendant routinely enforced safety rules against employees regardless of whether they reported an injury, the ambiguities latent in the manager's declaration undermine its probative value. Ms. Donovan's declaration therefore does not amount to clear and convincing evidence that Defendant would still have disciplined Plaintiff in the absence of his injury report. Therefore,

44

Defendant's motion for summary judgment on Plaintiff's FRSA retaliation claim as to the gasket-incident discipline for "failure to take the safest course," dkt. no. 22, is **DENIED**.

    **b. Defendant does not carry its burden as to the 2019 extended break discipline.**

Overall, Defendant does not present "clear and convincing evidence" that it would still have disciplined Plaintiff for taking an extended break absent his injury report. Defendant presents strong evidence in its favor: Defendant shows that Plaintiff was previously disciplined (and cited for a more serious offense) when a manager reported that he had been sleeping. Dkt. No. 22-1 at 20; Dkt. No. 22-4 at 6. In that circumstance, Plaintiff's manager entered an assessment stating that Plaintiff "was observed in a reclined position sleeping" in a locomotive cab. Dkt. No. 22-4 at 6. Defendant disciplined Plaintiff for this violation before Plaintiff's injury report occurred, so this discipline could not have been retaliation. See id. Moreover, Plaintiff does not argue that his 2017 discipline for sleeping on a locomotive was retaliation or related to his claims in this case. See generally Dkt. No. 26.

The 2019 extended-break-incident was very similar to this 2017 sleeping-in-a-locomotive incident. As with the 2017 assessment, in 2019, Plaintiff's manager entered an assessment stating that Plaintiff "was observed sleeping" in a locomotive

cab. Dkt. No. 22-4 at 6.[5] And in the 2019 extended-break discipline, Defendant treated Plaintiff similarly—if not more favorably—than in 2017, charging him with the lesser offense of taking an extended break. Dkt. No. 22-5 ¶ 18; Dkt. No. 22-6 ¶ 20. This prior history of non-retaliatory discipline for a sleeping assessment supports that Defendant would still have disciplined Plaintiff in 2019 even if he had not reported his 2018 injury.

Moreover, Mr. White, Plaintiff's colleague, committed the same conduct as Plaintiff in the 2019 incident, and Defendant charged and disciplined Mr. White for the same offense as Plaintiff. Dkt. No. 22-4 ¶¶ 7, 9; Dkt. No. 22-5 ¶ 18; Dkt. No. 22-6 ¶¶ 20, 22. This further supports that Defendant would still have disciplined Plaintiff.

However, that both Plaintiff and Mr. White were charged does not foreclose the possibility that Defendant was motivated by retaliatory animus, especially considering Mr. Gibson's testimony that Plaintiff's managers were essentially waiting for Plaintiff to make a mistake. Dkt. No. 26-2 at 54:25–55:24. Drawing inferences in favor of Plaintiff, Plaintiff's colleague could have been disciplined merely as a collateral consequence of Defendant's

---

[5] Plaintiff disputes that he was actually sleeping in 2019, dkt. no. 26-1 at 101:17–23, but because the managers in 2017 and 2019 both believed that Plaintiff was sleeping and entered an assessment stating as much, dkt. no. 22-4 at 6, this is still a valid comparison.

desire to retaliate against Plaintiff. This inference is further supported by Plaintiff's testimony that Plaintiff's supervisor told Mr. White that he had "gotten caught up in the crosshairs of what was going on." Dkt. No. 26-1 at 91:23–94:7.

Defendant objects to Plaintiff's testimony on this topic as inadmissible evidence. Dkt. No. 28 at 10. This testimony is what is colloquially known as "double hearsay" because (1) Plaintiff testified about a statement that Mr. White made to him—while not under oath—about (2) an out-of-court statement that Plaintiff's supervisor allegedly made to Mr. White while not under oath, and the statements are offered to "prove the truth of the matter asserted in the statement." See Fed. R. Evid. 801(c), 802; United States v. Robinson, 239 F. App'x 507, 508 (11th Cir. 2007) ("Hearsay within hearsay, or so-called 'double-hearsay,' is admissible only if each part of the combined statements conforms with an exception to the hearsay rule."). Here, Mr. White's statement seemingly does not fall under a hearsay exclusion or exception. See Fed. R. Evid. 801(d), 803, 807; Dkt. No. 28 at 10.

While "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment," "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Jones v. UPS Ground Freight, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (quoting Macuba

v. Deboer, 193 F.3d 1316, 1322–23 (11th Cir. 1999)). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." Id. However, courts may not consider hearsay evidence when "there is only a hypothetical witness who might come forward to testify at trial" or "the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement." Lewis v. Residential Mortg. Sols., 800 F. App'x 830, 834 (11th Cir. 2020) (citing Jones, 683 F.3d at 1294).

Here, Mr. White and Mr. Gibbs—identifiable declarants—can "testify directly to the matter at trial." Jones, 683 F.3d at 1294. Furthermore, neither Mr. White nor Mr. Gibbs has given sworn testimony contradicting the "crosshairs" statement. Neither party introduced testimony from Mr. White, and, drawing inferences in Plaintiff's favor, Mr. Gibbs's affidavit does not contradict the statement directly or indirectly, it simply recites the facts surrounding the incident, see generally dkt. no. 22-5. Thus, the Court may consider Plaintiff's testimony about the "crosshairs" comment. This comment weakens the probative value of Mr. White's identical charge since a juror could reasonably infer that Defendant only charged Mr. White because it wanted to discipline Plaintiff. Overall, Mr. White's identical charge does provide further evidence—albeit weaker than Plaintiff's 2017 discipline—to support that Defendant would still have disciplined Plaintiff

regardless of his injury report.

At bottom, although Defendant presents evidence to support its burden, it fails to present "by clear and convincing evidence [] that it would have taken the same unfavorable personnel action in the absence of the plaintiff's protected activity." Grantham, 2022 WL 677575, at *3 (alterations accepted). Importantly, Defendant's evidence does not necessarily conflict with Mr. Gibson's testimony that Defendant does not routinely punish its employees for taking extended breaks. Dkt. No. 26-2 at 55:9–13. Drawing inferences in Plaintiff's favor, he could have been one of the unlucky few that Defendant arbitrarily punished in 2017, and then Defendant could have retaliated against him in 2019. While perhaps not the most probable explanation, it is a reasonable interpretation given the evidence provided. The combination of lack of affirmative evidence indicating that Defendant regularly punishes employees for this behavior and Mr. Gibson's testimony indicating that Defendant does not regularly punish employees for this behavior creates enough doubt such that the Court cannot conclude it is "highly probable" that Defendant would still have disciplined Plaintiff absent his protected activity. Id.

Persuasive caselaw supports this conclusion. For example, in Mosby v. Kansas City Southern Railway Co., Case No. 14-cv-472, 2015 WL 4408406, at *7 (E.D. Okla. July 20, 2015), the court found that the defendant failed to satisfy its burden as to the second

49

step of the FRSA retaliation analysis. The court noted that, although the defendant argued the plaintiff had violated its rules and "that it consistently discipline[d] employees for such violations," the plaintiff "introduced evidence that [the defendant] was not consistent in [its] discipline." Id. Like the Mosby plaintiff, Plaintiff has introduced evidence in the form of Mr. Gibson's testimony that Defendant was not consistent in its discipline.

In contrast, in Echols, ARB Case No. 16-022, at *2-5, the ARB affirmed the ALJ's finding that the employer had carried its burden where the ALJ found that the employer "routinely monitors compliance with [the relevant rule], formally trains employees on compliance with the rule, and consistently imposes equivalent discipline on employees who violate the rule in the absence of an injury report." Even assuming Defendant formally trains its employees on the relevant rule, see, e.g., dkt. no. 26-1 at 10:20–25, 71:23–72:1 (Plaintiff received annual or biannual training on its rules), Defendant presents only two instances indicating that it imposed equivalent discipline on employees who violated the rule in the absence of an injury report (Plaintiff in 2017 and Mr. White in 2019). Dkt. No. 22-1 at 19–20; Dkt. No. 28 at 10. And for the reasons discussed, the evidence relating to Mr. White's discipline is not as probative as Plaintiff's 2017 discipline. Thus, Defendant presents substantially less evidence than the

defendant in Echols.

Defendant's other evidence in this case highlights its evidentiary shortfall related to the extended break: Defendant presents Ms. Donovan's testimony, which discusses *seventy* employees also disciplined for "safety rule" violations, in an attempt to show that it routinely disciplines employees for violating safety rules like the ones implicated in the gasket incident. Dkt. No. 22-4 ¶ 10. Defendant's evidence of two other disciplinary actions similar to Plaintiff's extended-break discipline is limited in comparison.

In conclusion, although Defendant presents probative evidence to support its argument, Mr. Gibson's testimony and lack of any systemic data on similar punishment leaves enough doubt that the Court cannot conclude it is "highly probable" that Defendant would still have disciplined Plaintiff in the absence of Plaintiff's injury report. The "crosshairs" comment only creates more doubt related to this issue. As the Court has noted, "[t]he clear-and-convincing-evidence burden is a steep hill for Defendants to climb, and not by accident." Grantham, 2022 WL 677575, at *6. As a result, Defendant's evidence, while not insubstantial, does not clear this hurdle.

## IV. Plaintiff's constructive discharge claim fails.

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point

such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Green v. Brennan, 578 U.S. 547, 555 (2016) (quoting Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)). To prevail on a constructive discharge claim, a plaintiff must prove two elements: (1) "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign," and (2) "he actually resigned." Id. The parties agree that this standard applies to claims in the FRSA context. See Dkt. No. 22-1 at 20-21 (citing Green, 578 U.S. at 555); Dkt. No. 26 at 16.

The Eleventh Circuit has explained that "[t]he threshold [for constructive discharge claims] 'is quite high,'" and "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." Beltrami v. Special Couns., Inc., 170 F. App'x 61, 62-63 (11th Cir. 2006) (first quoting Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001); and then quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987)). The Eleventh Circuit "has required pervasive conduct before finding that a hostile work environment or constructive discharge occurred." Hipp, 252 F.3d at 1231-32 (collecting cases). Furthermore, "[e]stablishing a constructive discharge claim is a more onerous task than establishing a hostile work environment

claim." Bryant v. Jones, 575 F.3d 1281, 1298-99 (11th Cir. 2009) (citing Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)). Even drawing all reasonable inferences in Plaintiff's favor, Plaintiff cannot show that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign." Green, 578 U.S. at 555.

"In evaluating the objective severity of the harassment," courts in the Eleventh Circuit consider, "among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002). Hipp, 252 F.3d at 1231, illustrates this standard well. In Hipp, the Plaintiff argued that his superiors "harassed him until he felt he had no choice but to resign." 252 F.3d at 1232. The plaintiff pointed to comments his superiors made that demonstrated age animus and two instances where one of the superiors "verbally attacked him," telling him "he should quit if he was unable to do the job" or that he was doing a "lousy job." Id. at 1233 (alteration accepted). The Eleventh Circuit noted that while it "might disagree" with the defendant's behavior, it did not rise to the level of constructive discharge. Id. at 1233-34. In so holding, the Hipp court cited a Third Circuit case for the proposition that

a "constructive discharge claim based solely on evidence of close
supervision of job performance must be critically examined" to
ensure that the constructive discharge claim "is not improperly
used as a means of thwarting an employer's nondiscriminatory
efforts to insist on high standards." Id. at 1234 (quoting Clowes
v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993))
(analyzing a constructive discharge claim under the Age
Discrimination in Employment Act). The court further cited a Fourth
Circuit case, noting that "[e]very job has its frustrations,
challenges, and disappointments. An employee is protected from a
calculated effort to pressure him into resignation through the
imposition of unreasonably harsh conditions, in excess of those
faced by his co-workers. He is not, however, guaranteed a working
environment free of stress." Id. (alterations accepted) (quoting
Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).

Similarly, in Morris v. Starwood Hotels & Resorts Worldwide,
Inc., No. 2:13-CV-00588-AKK, 2015 WL 4744536, at *3-4 (N.D. Ala.
Aug. 11, 2015), the court found that the Plaintiff's allegations
that he experienced daily harassing conduct was not "so objectively
severe that it would have caused any reasonable employee to resign"
because "the only specific conduct [the plaintiff] allege[d]
consist[ed] of verbal reprimands relating to his work and body
language meant to provoke him into striking [his supervisor]."

In this case, Plaintiff points to the following evidence to support his constructive discharge claim: (1) his own testimony that "he felt he was being watched at every moment after he reported his injury"; (2) Mr. Gibson's testimony "that management was watching his every move, just waiting for him to slip up so they could get rid of him"; and (3) Plaintiff's manager telling Plaintiff "you know you are being watched." Dkt. No. 26 at 16–17. While frequent, this conduct is less severe than the conduct experienced by the Hipp and Morris plaintiffs, the conduct is not "physically threatening or humiliating," and being watched does not "unreasonably interfere with [Plaintiff's] job performance." Miller, 277 F.3d at 1276. Thus, Plaintiff fails to show that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign." Green, 578 U.S. at 555.

Other cases support that continual scrutiny is usually insufficient on its own to present a constructive discharge claim. In Errickson v. Lakeland Regional Medical Center, Inc., No. 8:22-CV-533-VMC-CPT, 2022 WL 3139223, at *5 (M.D. Fla. Aug. 5, 2022), the court held that the plaintiff's assertion that she "'was watched and timed during her breaks during work where other co-workers were not,' and that she was reprimanded for sitting down" "is insufficient to suggest that the alleged harassment was severe." See also Moody v. InTown Suites, No. 1:04-CV-1198-TWT-

AJB, 2006 WL 8431638, at *35 (N.D. Ga. Feb. 1, 2006), R&R adopted
sub nom. Moody v. Intown Suites Mgmt., Inc., No. CIV.A.1:04CV1198-
TWT, 2006 WL 870388 (N.D. Ga. Mar. 31, 2006) ("[T]he close
monitoring of [a plaintiff] alone does not suggest that it is based
on race and is insufficient to show constructive discharge.");
Spivey v. Enter. City Bd. of Educ., No. 1:18-CV-427-SRW, 2019 WL
357983, at *6 (M.D. Ala. Jan. 29, 2019) (dismissing the plaintiff's
constructive discharge claim in part because her allegations "that
she was subjected to harassment and retaliation by 'being removed
from supervisory responsibility as a teacher and [receiving]
closer scrutiny than other employees'" were "not severe or
pervasive enough to alter the terms of her employment").
Plaintiff's evidence is very similar to the Errickson plaintiff's
assertions—Plaintiff offers evidence that he was scrutinized more
closely than other employees and told he was "being watched." Dkt.
No. 26 at 16–17. As in Errickson, this evidence "is insufficient
to suggest that the alleged harassment was severe." Errickson,
2022 WL 3139223, at *5. Therefore, Defendant's motion for summary
judgment, dkt. no. 22, is **GRANTED** as to Plaintiff's constructive
discharge claim.

## V.  **Plaintiff's claim for punitive damages does not merit dismissal.**

A plaintiff may receive punitive damages for an FRSA
retaliation claim if the Defendant "acted with malice or ill will

or with knowledge that its actions violated federal law or with reckless disregard or callous indifference that its actions violated federal law." Grantham, 2022 WL 677575, at *8. As discussed, Plaintiff produced evidence indicating that Defendant disciplined him to punish him for reporting an injury. See supra pp. 29–40. A reasonable juror, if she believes Plaintiff's evidence, could find that this constitutes "malice or ill will." Thus, Defendant's motion for summary judgment, dkt. no. 22, is **DENIED** as to Plaintiff's claim for punitive damages.

## CONCLUSION

Plaintiff successfully presented a prima face case of retaliation for the two adverse disciplinary actions—the gasket incident discipline and the extended break discipline—he faced after his 2018 injury report. Defendant failed to present, by clear and convincing evidence, that it would have disciplined Plaintiff for both the adverse actions in the absence of Plaintiff's injury report. Thus, Defendant's motion for summary judgment, dkt. no. 22., is **DENIED** as to Plaintiff's FRSA retaliation claims. However, Plaintiff's constructive discharge claim fails because he does not present sufficient evidence that he was discriminated against to the point where a reasonable person in his position would have felt compelled to resign. Defendant's motion for summary judgment, id., is therefore **GRANTED** as to Plaintiff's claim that Defendant constructively discharged him. Finally, Defendant's motion for

summary judgment is **DENIED** as to Plaintiff's punitive damages claim because a reasonable juror could find that Defendant acted with malice or ill will.

Further, in accordance with the Court's March 2, 2023 Order, dkt. no. 30, the parties are **ORDERED** to file proposed consolidated pretrial order within **thirty-one (31) days** of the date of this Order.

**SO ORDERED** this 14th day of July, 2023.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA